**In re HOLOCAUST VICTIM ASSETS LITIGATION.**

**Nos. CV–96–4849(ERK)(MDG), CV–99–5161, CV–97–461.**

United States District Court, E.D. New York.

March 9, 2004.

Burt Neuborne, New York University Law School, New York, NY, lead class counsel.

Robert A. Swift, Kohn, Swift & Graf, P.C., Philadelphia, PA, one of plaintiffs' class counsel.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Holocaust Survivors Foundation–USA, Inc.

Roger M. Witten and Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

I address here yet another issue that has arisen with respect to the $1.25 billion settlement of the class action against the largest Swiss banks, Credit Suisse, Union Bank of Switzerland and the Swiss Bank Corporation (the latter two of which merged during the course of litigation). The background of the case and settlement is set out in *In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d. 139 (E.D.N.Y. 2000), and a discussion of some of the post-settlement issues may be found at *In re*

*Holocaust Victim Assets Litigation*, No. CV-96-4849, 302 F.Supp.2d 59, 2004 WL 318468 (E.D.N.Y. February 19, 2004), *In re Holocaust Victim Assets Litigation*, 270 F.Supp.2d 313 (E.D.N.Y.2002), and at *In re Holocaust Victim Assets Litigation*, No. 96 Civ. 4849ERK MDG, 2000 WL 33241660 (E.D.N.Y. November 22, 2000).

The specific issue here involves a dispute relating to the allocation of part of the proceeds of the settlement. Briefly, one of the classes benefitting from the settlement was comprised of victims of Nazi persecution from whom assets were looted by the Nazis and the plunder of which was aided by Swiss banks. Special Master Judah Gribetz recommended initially that $100 million be allocated to this Looted Assets Class and that the money be distributed to its neediest members. *See* Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds 110–142 (hereafter "Plan of Allocation"). I discuss later the reasons underlying that recommendation, which I adopted on November 22, 2000, *see In re Holocaust Victim Assets Litig.*, 2000 WL 33241660, and which the Second Circuit affirmed on July 26, 2001. *See In re Holocaust Victim Assets Litig.*, 14 Fed.Appx. 132, 134 (2d Cir.2001). On September 25, 2002, I adopted another recommendation of the Special Master that an additional $45 million in "excess" funds be allocated to that class. Finally, on November 17, 2003, I adopted the recommendation of the Special Master that $60 million in "excess" funds be allocated to the Looted Assets Class and be distributed in accordance with the *cy pres* principles that have successfully governed the administration of the initial allocation and distribution of $100 million to the Looted Assets Class in 2001, and the first supplemental allocation and distribution of $45 million in 2002.

I also adopted the Special Master's recommendations made in response to my request seeking his view on the appropriateness of allocation of money, if any, that may remain undistributed from the $800 million allocated to the Deposited Assets Class, which is composed largely of heirs of victims of Nazi persecution who deposited funds in Swiss banks. The Special Master recommended that, "as with the excess funds, residual unclaimed funds, if any, should likewise be re-allocated to the Looted Assets Class for distribution to needy Nazi victims in accordance with the *cy pres* principles governing the administration of that class." Special Master's Interim Report on Distribution and Recommendation for Allocation of Excess and Possible Unclaimed Residual Funds, at 7 (hereafter "Special Master's Interim Report"). Because any such distribution would involve residual unclaimed funds, "the disposition of which has not yet been the subject of discussion by class members, the Special Master recommend[ed] that the Court solicit proposals from a broad array of interested persons and organizations as to how best to identify and to benefit the neediest survivors." *Id.* He further urged that, "depending upon the amount of residual, if any, the Court may wish to consider a modest distribution to communal, remembrance and/or educational programs." *Id.* at 13 n. 14.

The Special Master observed that, by the end of the proposed filing and comment period in connection with proposals submitted by interested persons and organizations, a reasonably firm Deposited Assets Class distribution assessment should be available, rendering it possible to estimate the amount of unclaimed funds, if any, available for *cy pres* distribution. At that point, after considering such proposals, the Special Master will issue a final recommendation as to how to distribute unclaimed funds. The date provided in my

November 17, 2003 order for the submission of the final recommendation of the Special Master was March 15, 2004. I subsequently received numerous requests for additional time to submit proposals, and I extended the date for the Special Master's final recommendation to April 16, 2004. After a public hearing to be held on April 29, 2004, I will make a final determination as to the distribution of any residual funds.

My order of November 17, 2003 also explicitly rejected objections that had been filed by Samuel Dubbin on behalf of the Holocaust Survivors Foundation–USA, Inc., (HSF–USA), and those filed by Robert Swift. I indicated then that an opinion would follow, and I now provide that opinion. The Special Master's Interim Report, the Declaration of Burt Neuborne in Support of the Interim Report of the Special Master (hereafter "Neuborne Declaration"), and the Supplemental Declaration of Burt Neuborne in Response to Objections to the Special Master's Interim Report and Recommendation Filed by Samuel Dubbin, Esq. (hereafter "Supplemental Neuborne Declaration") provide a compelling case for the adoption of the recommendation of the Special Master. The principal purpose of this memorandum is to more specifically address the objections filed by Mr. Dubbin on behalf of HSF–USA.

Mr. Dubbin has been filing objections for several years, all premised on the same flawed reasoning. *See* Motion for Immediate Interim Distribution of Swiss Settlement Proceeds, filed September 11, 2003 (hereafter "Motion for Immediate Distribution"); Response of Holocaust Survivors Foundation–USA, Inc. to Special Master's Interim Recommendation (hereafter "HSF Response"); Objections of U.S. Survivor Groups to Special Master's Recommendations Concerning Allocation of Accumulated Interest on Settlement Funds, filed September 27, 2002 (hereafter "HSF Objection to Allocation of Interest"). While the HSF–USA has never demonstrated that it has any legal standing to raise these objections (a point I will discuss later), it is important to address them on the merits. Professor Neuborne has done so in a characteristically comprehensive and thoughtful affidavit. *See* Supplemental Neuborne Declaration. I do so here.

### Part I: The Merits of HSF–USA's Objections

As Professor Neuborne observed, HSF–USA's objections can be divided into three categories. First is Mr. Dubbin's demand that I make a larger amount available for "immediate distribution" to members of the Looted Assets Class. Second is his objection to the allocation formula that has thus far governed the distribution of money to the Looted Assets Class. And third is his challenge to my continued use of the American Jewish Joint Distribution Committee, Inc., for distribution of settlement funds. As to the third objection, I adopt Professor Neuborne's response without repeating it. *See* Supplemental Neuborne Declaration, at ¶ 22; *see also* Letter from Steven Schwager to Professor Neuborne, dated October 29, 2003. I address the first and second objections below.

### A. Mr. Dubbin's demand for a larger "immediate distribution"

■ The Special Master proposed, and I ordered, that the $60 million in excess funds that have accrued through interest on the settlement fund be made available for immediate distribution to members of the Looted Assets Class. Instead of this distribution of $60 million, Mr. Dubbin would have me allocate to the Looted Assets Class $200 million of the $650 million that remains set aside for possible distribution to claimants to accounts in Swiss

banks that were either unpaid or transferred improperly to the Nazis. *See* Motion for Immediate Distribution. Of the $200 million, Mr. Dubbin demands that a minimum of $50 million be set aside for "immediate distribution" to survivors in the United States. *Id.* I reject Mr. Dubbin's objection.

First and foremost, Mr. Dubbin's proposal does not call for the "immediate distribution" of any funds to survivors, as the title of his motion and its introduction misleadingly suggest. Rather, Mr. Dubbin proposes that $50 million be "set aside in trust to be spent in accordance with the decisions of a committee of HSF survivors," representatives of other organizations, and "the Court." Motion for Immediate Distribution, at 1 n. 1. This "Dubbin Committee," of which he proposes to make me a member, would make decisions on "[t]he use of such funds ... guided by an assessment of current need, and the likelihood and timing of funds from other sources such as the Claims Conference (Successor Organization Funds), the International Commission for Holocaust Era Insurance Claims (ICHEIC) 'humanitarian funds,' and the Final Secondary Distribution in this case." *Id.* The "Dubbin Committee" proposal foreshadows a drawn-out process rife with potential for disagreement among its members. Indeed, disagreement leading to the resignation of several founding members of HSF–USA has already occurred. *See* Nacha Cattan, *Survivors' Group Leaders Split Over Aid,* The Forward, January 16, 2004; *see also* Israel J. Sachs et al., Letter to the Editor, The Forward, January 23, 2004 ("It is our belief that our goals should be pursued through discussion and negotiation, not by fights that pit one Jew against another."). Such a committee (which may or may not be able to distribute money faster than the procedures currently employed) is not necessary. Nor is it consistent with the control—not a seat on a committee—that the law requires that I exercise over the distribution process.

More importantly, the time is simply not ripe for a larger "immediate distribution" of residual funds to members of the Looted Assets Class. Mr. Dubbin claims that, "[t]here is over $670 million dollars under the Court's control right now, sitting in the bank, helping no one other than the bankers." HSF Response, at 2. He continues, "[t]his money is, legally and morally, *the Survivors' money.*" Motion for Immediate Distribution, at 10. These statements reveal Mr. Dubbin's basic misunderstanding of the settlement. The $800 million that was set aside for individuals with claims against the Swiss Banks for deposited assets (of which approximately $650 million now remains) belongs to *those* survivors or their heirs. It was not set aside for, nor does it belong to, the survivor community as whole. This large sum was set aside in part because, of all the claims asserted against the Swiss Banks, only the claims of the Deposited Assets Class have any legal merit. The other claims could not have withstood a motion to dismiss. As the Second Circuit explained in affirming my decision:

> [The Deposited Assets Class] claims are based on well-established legal principles, have the ability of being proved with concrete documentation, and are readily valuated in terms of time and inflation. By contrast, the claims of the other four classes are based on novel and untested legal theories of liability, would have been very difficult to prove at trial, and will be very difficult to accurately valuate.

*In re Holocaust Victim Assets Litig.,* 14 Fed.Appx. 132, 134 (2d Cir.2001).

Under these circumstances, I have a legal and moral obligation to the Deposited

Assets Class not to use the funds that belong to it for a *cy pres* distribution until I am *certain* that the claims to those funds will not exceed the amount set aside. The $800 million set aside already takes into account the certainty that, due to the passage of time, the destruction of documents and the slaughter of millions, claims awarded will not equal the current value of accounts identified by the Volcker Committee as probably or possibly belonging to survivors. Indeed, it is a half billion dollars less than the present value of such accounts. Moreover, as I explained in my order of February 19, 2004, *see In re Holocaust Victim Assets Litig.*, No. CV-96-4849, 302 F.Supp.2d 59, 2004 WL 318468 (E.D.N.Y. February 19, 2004), the accounts identified by the Volcker Committee as probably or possibly belonging to Nazi survivors understate significantly the number of accounts once belonging to survivors.

Nevertheless, Mr. Dubbin argues that "$200 million is a sum that no reasonable person would argue is too high of a minimum estimate of the amount that will remain from the $800 million set aside for Deposited Assets such that the allocation of the amount today would interfere with the payment of meritorious pending claims." Motion for Immediate Distribution, at 3. I disagree. Whether $200 million will remain from the $800 million set aside for the Deposited Assets Class is not yet knowable. The Special Master has indicated that several things must happen before he can accurately estimate the amount of residual funds, if any, that will remain from money allocated to the Deposited Assets Class. Of primary importance, additional accounts should be published in order to help identify any remaining claimants; the Claims Resolution Tribunal ("CRT") must complete an experimental trial of matching names against accounts in the Total Accounts Databases ("TAD"); the CRT must then be given broader access to the TAD if the experimental matching so demands; and the CRT must be given time to use a newly improved computer system in an effort to match claimants' names against accounts that might have belonged to Nazi victims. Of course, several of these steps have yet to be completed. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 59, 2004 WL 318468.

The order I have signed directs the Special Master to provide an accurate estimate of the amount set aside for the Deposited Assets Class that will not be distributed to the members of that class, if any, by April 16, 2004. Because of ongoing concerns described in the paragraph above, it appears that more time may be required. Nevertheless, whether or not it is possible for him to provide an accurate estimate by April 16, 2004, he will by that date provide a recommendation for the *cy pres* distribution of any residual funds. After hearing proposals from interested parties, I will decide on a plan of allocation. Because of my obligations to the Deposited Assets Class, I reject Mr. Dubbin's objection that this delay is unreasonable. In advance of hearing all proposals and the Special Master's recommendation, I will not allocate $50 million "in trust" to a committee to decide how it should be spent. Nor will I set aside an additional $150 million that belongs to bank account holders or their heirs for distribution among the survivor community as a whole.

## B. Mr. Dubbin's challenge to the allocation formula used in distributing funds

■ Mr. Dubbin also objects to the allocation formula that governs the distribution of the additional $60 million that is now being allocated. This objection is consistent with his prior appeal from the initial allocation of $100 million to needy

members of the Looted Assets Class and his objection to the $45 million allocated to needy victims of Nazi persecution in the first allocation of excess funds. Mr. Dubbin withdrew his appeal from the initial allocation, and I denied his objection to the first allocation of excess funds as untimely. Mr. Dubbin has filed a motion for reconsideration of that order and he has filed a motion for reconsideration in reference to the most recent denial, both of which are still pending. I have never specifically addressed his objections on the merits.

Mr. Dubbin's objections can be summarized as follows: He agrees that funds allocated to the Looted Assets Class should be distributed through a *cy pres* distribution to the neediest survivors, but only after distributing the funds *pro rata* among countries. Put differently, he argues that a survivor community in a given country should be allocated (for the benefit of its neediest survivors only) a percentage of the Looted Assets Class funds equal to whatever percentage of the world survivor community it represents. This proposal is tailored to benefit individuals who are a part of a small group of needy survivors within a large nationwide survivor population. Not surprisingly, needy survivors in the United States—whose interests Mr. Dubbin claims to represent—are just such a group. This proposed distribution scheme is wholly inconsistent with law, morality, and most importantly, the settlement of this lawsuit. In sum, these objections are frivolous. Several are also likely precluded by the withdrawal of Mr. Dubbin's initial appeal. But because the objections have been recurring, I address them now in the hope that they can be put to rest.

*1. The rationale for my distribution plan*

The reasons underlying the distribution plan that I have overseen for the Looted Assets Class are described comprehensively in the Special Master's Plan of Allocation. Nevertheless, because of Mr. Dubbin's apparent misunderstanding of these reasons, I take this opportunity to explain, once again, how we are distributing the money.

The Looted Assets Class is incredibly large. It consists of:

> Victims or Targets of Nazi Persecution and their heirs, successors, administrators, executors, affiliates, and assigns who have or at any time have asserted, assert, or may in the future seek to assert Claims against any Releasee for relief of any kind whatsoever relating to or arising in any way from Looted Assets or Cloaked Assets or any effort to recover Looted Assets or Cloaked Assets.

Settlement Agreement, Section 8.2(b). As the Special Master correctly reasoned, "[t]here is scarcely a victim of the Nazis who was not looted, and on nearly an incomprehensible scale." Plan of Allocation, at 111. After all, "it is well accepted by historians, including those representing Switzerland, that a primary purpose of the Nazi plunder was to transform loot (especially, but not only gold) into foreign currency by marketing these items in neutral nations, including Switzerland." *Id.* at 114. "With only limited exceptions, however, the current historical record simply does not permit precise determinations even as to the material losses in total, much less the nature and value of the loot traceable to Switzerland or Swiss entities." *Id.* at 112. To prevent the expenditure of incredible sums on administration, the Special Master recommended that for allocation purposes, I assume that all survivors of the Holocaust and their heirs were valid members of this class, even if they could not prove an injury directly tied to a Swiss entity. I agreed.

I then was faced with two obvious and unsatisfactory possibilities for how to govern the distribution of money to this enormous class. I could have used a claims resolution facility to determine the validity and value of claims on a case-by-case basis, or I could have ordered a *pro rata* distribution to every member of the class. The first option, given the complete lack of adequate records, would have resulted in "an unwieldy and enormously expensive apparatus to adjudicate hundreds of thousands of claims, for losses which can barely be measured and hardly be documented, and whose connection to Switzerland, or a Swiss entity, if ever it existed, probably no longer can be proven." *Id.* at 114–15. The second option, which is apparently what Mr. Swift—whose objections I rejected in my November 17, 2003 order—would prefer, was equally problematic. Mr. Swift continues to argue that there should be a *pro rata* distribution to the approximately 500,000 Looted Assets Class members who filled out "detailed claim forms." Declaration of Robert A. Swift in Opposition to the Interim Report of the Special Master, ¶ 3. These "detailed claim forms" were non-binding questionnaires that explicitly stated that an individual could later make a claim without having filled out such a questionnaire. The class, therefore, is not limited to these 500,000 individuals. Rather, for allocation purposes, the class includes all those who were victims of the Holocaust *and their heirs*. A *pro rata* distribution would have resulted in the payment of literally pennies to each of the millions of individuals who would fall into this class. Such a distribution scheme is not uncommon in class action cases where members of the class get pennies or coupons, the cumulative total of which is used to justify awarding millions of dollars in legal fees. But such a plan is wholly unsatisfactory here because it promises almost no benefit to members of the class.

Indeed, if Mr. Swift's proposal were the only alternative, I would ask the Special Master to suggest a *cy pres* distribution of the excess funds for a purpose other than providing assistance to members of the Looted Assets Class.

Fortunately, there is a more reasonable alternative. The Special Master recommended excluding heirs from any *pro rata* distribution, as was done with the Refugee and Slave Labor classes. While this would have increased the *pro rata* share of survivors, it would still have resulted in one-time individual awards that would not have been enough to provide any assistance to needy survivors and would have been insignificant to those who are not needy. Consequently, I adopted the accompanying recommendation of the Special Master and ordered a *cy pres* remedy targeting the neediest survivors in the Looted Assets Class. *See* Special Master's Interim Report, at 3 n. 3. The Special Master reasoned that these individuals "perhaps would be less in need today had their assets not been looted and their lives nearly destroyed" during the Nazi era. Plan of Allocation, at 117. I agreed that using the funds to provide relief to these neediest survivors over the course of ten years would be the way to most benefit the class as a whole. In order to reduce administrative costs, these funds were funneled through organizations that were already providing relief to survivor communities and could quickly provide aid. I reserved the right to grant other *cy pres* remedies as worthwhile proposals are presented, but my principal decision was consistent with Second Circuit law. *See In re Agent Orange Product Liability Litig.*, 818 F.2d 145, 158 (2d Cir.1987) (explicitly authorizing a district court to "give as much help as possible to individuals who, in general, are most in need of assistance" because it is "equitable to limit payments to those

with the most severe injuries"). Indeed, the Second Circuit agreed. *See In re Holocaust Victim Assets Litig.,* 14 Fed.Appx. 132 (2d Cir.2001) (finding that appellants' challenge to my decision to apply the *cy pres* doctrine to the Looted Assets Class "lack[ed] merit").

The next step, which is apparently the only step at which Mr. Dubbin and I diverge, was the determination of who are the neediest survivors of the Holocaust. A comparison of needy survivors is by definition an odious process. All individuals who survived the Holocaust bear scars, and all merit relief. Nevertheless, left with limited funds to distribute, I had to render a judgment as to whose need was the greatest. I decided that 90% of the funds should be awarded to Jewish survivors, and 10% should be awarded to other victims of the Holocaust, including surviving Roma, Jehovah's Witness, homosexual and disabled victims of Nazi persecution. This decision was consistent with restitution agreements dating back to the end of the war and with current assessments of demographics. *See* Plan of Allocation, at 118–19 and Annex C ("Demographics of 'Victim or Target' Groups"). Of the 90% awarded to Jewish survivors, I determined that 75% should be allocated to needy survivors living in the Former Soviet Union ("FSU"), and 25% should be allocated to needy survivors living in Israel, North America, Europe, and the rest of the world. Ultimately, approximately 4% of the funds from the Looted Assets Class has been allocated to needy survivors in the United States. The decision to allocate 75% of the money awarded to Jewish members of the Looted Assets Class to needy survivors in the FSU while allocating only 4% of the money to needy survivors in the United States was not arrived at lightly. It was based on what I perceived to be the number of impoverished survivors in each country, their relative need,

and their other available sources of support. However, it is this decision that caused Mr. Dubbin to object. Thus, it is this division, 75% as compared to 4%, on which I focus.

### 2. Identifying the neediest survivors

According to the most comprehensive demographic studies available, there are between 832,000 and 960,000 Jewish survivors of Nazi persecution. *See generally* Plan of Allocation, Annex C (explaining the demographic data). Of these, approximately 19%–27% live in the FSU, and 14%–19% live in the United States. *See id.* at 11. Although debate continues over the precise percentages, there is a general consensus that this is the approximate distribution. Indeed, these numbers were confirmed by the recent report of independent researchers from Brandeis University. *See* Jewish Elderly Nazi Victims: A Synthesis of Comparative Information on Hardship and Need in the United States, Israel, and the Former Soviet Union (January 20, 2004) (Report prepared for the JDC) (hereafter "Brandeis Report"). The Brandeis Report was an effort to compare the communities of Jewish survivors in the United States, Israel and the FSU in terms of size, and in terms of need. It relied on prior surveys of the Nazi victim population in each region, and documented only one survey that deviated from the figures provided above—a survey that used a different definition of "survivor" and found that only 13% lived in the FSU and 16% lived in the United States, with a greater majority living in Israel. *Id.* at 21. The rest of the surveys considered by the Brandeis Report found that approximately 22%–23% of Jewish survivors of Nazi persecution live in the FSU, and 15%–17% live in the United States. *Id.* The Brandeis Report made no recommendations, but it drew many conclusions. Published

several years after the Special Master filed his Plan of Allocation, the Brandeis Report confirmed the assessment of the Special Master that the population of *needy* survivors is distributed quite differently than the population of survivors. Before turning to an examination of this differential distribution, I attempt to briefly explain why it exists.

With the onset of the Cold War, survivors in the FSU were essentially cut off from the West. Since then, survivors in the United States have shared in various distributions that began with the end of the Nazi era and have continued until today, while survivors behind the Iron Curtain have received next to nothing. The Special Master exhaustively and impressively chronicled the course of Holocaust compensation in Annex E of his Plan of Allocation. Here, it suffices to restate its conclusions. Including the multiple class awards in this case, there have been ten major compensation efforts since the end of the war. The principle efforts, preceding this one, have been the Federal German Indemnification Program ("BEG Pensions"), payments by the Israeli Ministry of Finance, the Hardship Fund, the Article 2 Fund, the Central and Eastern European Fund, and the German Slave Labor Fund. *These efforts and others, together with this lawsuit, have resulted in distributions of over $53 billion to individual survivors and programs serving individual survivors. See* Chart on Holocaust Compensation prepared by Special Master in consultation with the Claims Conference and other available sources (Draft, dated March 5, 2004). *Of this, approximately $14.8 billion, or just shy of 28% of all restitution funds has gone to survivors in the United States. Id. Comparatively, just under $444 million, or 0.8% of all restitution funds has gone to survivors in the FSU. Id.*

The primary reason for this imbalance is Germany's decades-long refusal to negotiate with those behind the Iron Curtain. In the BEG Pension distributions, which have for decades provided hundreds of thousands of survivors worldwide with monthly pensions, Germany excluded "all the survivors of Eastern Europe who did not emigrate to a non-Communist country." Plan of Allocation, Annex E, at 35. It did the same with the Article 2 Fund and with the Hardship Fund. In 1998, almost a decade after the end of the Cold War, Germany took a *small* step to rectify the imbalance by instituting the Central and Eastern European Fund ("CEEF").

The CEEF was set up "to compensate directly, for the first time, Holocaust victims who still remain in the former Soviet Union and Central and Eastern Europe." Plan of Allocation, Annex E, at 55. But this program was woefully inadequate. It defines "survivor" restrictively, thus continuing to ignore many victims of Nazi persecution who have never been compensated for their suffering with even a dime. To qualify for payments, a survivor must show that he or she was "confined or restricted" for at least six months in a concentration camp, prison camp, or forced labor battalion, or "confined or restricted" for at least 18 months in a ghetto, hiding in inhuman conditions, or as a child living under a false identity. *See id.* at 49–50. Jews who survived five months in a concentration camp do not qualify for payments. Nor do the many Jews who fled their homes as the Nazis approached, losing property of incalculable value. In 1999, before the distribution of settlement funds from this case had begun, Dovid Katz, a Professor of Yiddish language, literature and culture at the University of Vilnius in Lithuania, movingly explained the situation for these poor survivors:

The last elderly Jews of Eastern Europe, whose lives were ruined by the Holocaust, and who choose to live out their days in the towns of their ancestors, are suffering acutely from malnutrition, poverty and lack of medicine, while the millions (or billions) from Germany, Switzerland and the great American Jewish organizations pass them by.

Dovid Katz, *How to Help the Holocaust's Last Victims*, The Forward, September 24, 1999 (cited in Plan of Allocation, at 124).

Survivors in the FSU also had to suffer through decades of Communism. This is why they are often referred to as "double victims." Stuart Eizenstat, the former Deputy Secretary of the Treasury who was instrumental in the efforts of the United States to bring about Holocaust restitution agreements, explained that he coined the term "double victims" after coming "face-to-face with the Holocaust survivor community of Eastern Europe." Stuart E. Eizenstat, Imperfect Justice, at 28 (2003). The individuals "had lived through both the Nazi massacre and the Communist repression that followed," and their faces reflected "the brutality of our time." *Id.* As brutal as life was under Communism, however, the situation for many elderly pensioners has become even worse with its collapse. *See* Plan of Allocation, Annex F ("Social Safety Nets"), at 2. "It is well known, for example, that the personal savings of many individuals in the FSU were wiped out by hyperinflation after the collapse of the Soviet Union." Brandeis Report, at 42. As a result, approximately 60% of all elderly now living in the FSU are impoverished, and the situation for survivors is particularly bad. Plan of Allocation, Annex F, at 2.

The survivor community in the FSU is currently served by a network of 177 Hesed service centers developed by the American Jewish Joint Distribution Committee ("JDC") beginning in 1992. Hesed is a Hebrew word meaning "acts of loving kindness," and these centers have lived up to their name. By 2001, the centers provided assistance to over 225,000 needy elderly Jews, approximately 135,000 of whom are Nazi victims. Because of their experience in serving this community, I have relied on the JDC, and in turn, these Hesed centers, to effectively distribute funds from the Looted Assets Class to survivors in the FSU. The centers provide hunger relief programs, home care, winter relief, and basic medical services. They have also been able to collect detailed information about the FSU's survivor population and provide accurate assessments of the community's level of need. Not surprisingly, the researchers preparing the Brandeis Report relied heavily on the Hesed network's database of each person assisted, including 135,000 registered survivors, in developing a comprehensive comparison of survivors' levels of need in the United States, Israel, and the FSU. *See* Brandeis Report, at 22–24. Put simply, survivors in the FSU are barely surviving.

The Brandeis Report recognizes that the 135,000 survivors served by Hesed centers are "by definition impoverished," and begins to explain how this destitution compares to the experience of survivors in the United States. Brandeis Report, at 39. For information on survivors in the United States, the Brandeis Report draws primarily on the National Jewish Population Survey (NJPS), one of the surveys that Mr. Dubbin now claims support his request for reconsideration of my decision denying his motion. *See id.* at 26–29; Request for Rehearing or Clarification of Court's November 17, 2003 Memorandum and Order, filed December 2, 2003. The NJPS was administered by the United Jewish Communities in 2000–2001 via telephone to approximately 4,500 Jews living

in the United States. *See* United Jewish Communities Report, Nazi Victims Now Residing in the United States: Findings from the National Jewish Population Survey 2000–01, Draft, dated December 18, 2003 (hereafter "NJPS Draft, dated December 18, 2003"). The survey included over 300 questions on a range of topics, including questions designed to ascertain whether a person was a Nazi victim. Of the 4,500 people surveyed, 146 were identified as Nazi victims. Thus, the information gleaned from the NJPS regarding the condition of survivors living in the United States (which it estimated to be a population of approximately 122,000) is based on questions posed to these 146 individuals. The Brandeis Report, "[f]aced with the task of describing the characteristics and the living conditions of the Jewish Nazi victim population in the USA," turned to other surveys to flesh out the conclusions of the NJPS. Brandeis Report, at 26. But because the other surveys often involved extremely small samples, the researchers were "forced to rely primarily on the NJPS even though it, too, is based on a small sample." *Id.* at 29. Despite the lack of better data describing the plight of the United States survivor population, the researchers were able to draw informative comparisons and conclusions.

The survivor community in the FSU constitutes between 32% and 40% of the total Jewish population in the FSU. Brandeis Report, at 36. The survivor community in the United States, on the other hand, makes up only 2.5% of the Jewish population. *Id.* While at first blush this statistic may appear insignificant, the Brandeis Report correctly points out that "[t]he high percentages [of survivors] in the FSU mean that there is a comparatively small Jewish community available to support victims." *Id.* This problem is exacerbated by the fact that while 56% of survivors in the United States are married

and 96% have children, only 41% of survivors in the FSU are married and only 44% have children. *Id.* In sum, family and community support networks are stretched thin in the FSU.

The absence of a support network, in conjunction with the lack of prior restitution and a host of other factors, has resulted in a financial situation of individual survivors in the FSU that is woeful in comparison to that of survivors in the United States. In 2000, the JDC explained the problem as follows:

> The fall of the Soviet Union struck the final blow to the economies and weak welfare systems of the successor states to the Soviet Union.... Jewish older persons are among those most affected by the economic decline. Governments do not have the capacity to maintain social safety nets to meet this population's needs. For example, prior to the ruble crisis in the summer of 1998, average pensions were as low as $9 per month in the Asian republics and $55 per month in Russia. By all accounts, these were extremely small amounts upon which to survive. Furthermore, in many cases, the governments had fallen behind in making these meager payments. The new crisis eroded the value of pensions even further and delayed payment of pensions, resulting in increasing hardships. Average pensions now do not exceed $20 [to $30] in any of the countries of the former Soviet Union. Indeed, most pensions are considerably less.

> The social and health care situation similarly reflects this deterioration. Lack of even the most basic supplies in hospitals is common. Patients must bring their own supplies, including medicine, bedding, and food in order to receive care. In addition, the overwhelming demand for services far exceeds the current gov-

ernmental capabilities. Services, moreover, are usually no longer provided for free and are often too expensive for an older person receiving a pension. These changes are reflected in the low ratings received by the countries of the FSU on the United Nations' Human Development Index. Out of 174 countries, Ukraine, for example, is ranked 102nd and Georgia 108th. Ukraine fell from 80th in 1995. This puts them in league with poor, developing nations.

Plan of Allocation, Annex F, at 4–5 (quoting *2000 Worldwide Program*, The American Jewish Joint Distribution Committee, Inc., at 66).

The circumstances have not changed since the Special Master filed his Plan of Allocation. Rather, they continue to confirm the recommendations of the Special Master. In January, 2004, the President of the United Jewish Communities traveled to the FSU to see firsthand the conditions of the Jewish community. He wrote:

I have seen severe non-Jewish poverty in my travels, but I had never seen Jewish poverty like this before. After visiting Jewish families living in small two room shacks, sheltering seven to eight people each and heated with coal stoves, I found myself profoundly grateful that we as Jews, through our federations and JDC, have a way to help. Like many of you who have visited the FSU, I had often visited more familiar scenes of shut-ins—older people who are assisted by our hunger relief programs. But here in Kharkov, the total poverty picture was striking, and the thought that we might lessen our efforts and allocations, well its just unacceptable.

Letter from Steven Schwager to Special Master Judah Gribetz, dated March 4, 2004 (enclosing e-mail from Stephen H. Hoffman, dated January 23, 2004). Dr. Spencer Foreman, the President of Mon-tefiore Hospital and a member of the Board of Directors of the JDC, wrote the Special Master to the same effect after his annual field visit to the FSU. Specifically, he again confirmed that the issue of medical care is a particular problem.

Diagnostic testing, specialties services and all but the most urgent hospital care are unavailable to those unable to pay for them, a group that includes virtually all of the Jewish elderly, and even when admitted to a hospital as an emergency out of pocket payment must be made for pharmaceuticals and medical equipment used during the hospitalization! Prescription medications are either unavailable or unaffordable for the average pensioner. Effective care is further strictured by the primitiveness of hospital and polyclinic facilities and by the scarcity of medical equipment, even the most basic items. While limited hospital care is available for trauma and acute medical problems, elderly patients with serious conditions such as stroke are often just sent home to linger bedridden or to die. A patient with a fractured hip, who in the West would be treated with a surgically inserted hip prosthesis and sent home in three days, is treated with traction for weeks then sent home, often with a non-union of the fracture, never to walk again. With the exception of a few major centers in Moscow and St. Petersburg and selected places available only to those who can pay, the services most people receive are at best comparable to those available in the U.S. in the 1950s, and they are in striking contrast to the high-quality care and advanced technologies to which elderly patients in the U.S. and Israel have access on a routine basis and for which, with a few exceptions, governmental or private payment is available.

Letter from Spencer Foreman to Special Master Judah Gribetz, dated January 15, 2004.

The International Organization for Migration, which oversees the distribution of Swiss Bank settlement funds to Roma, Jehovah's Witness, homosexual and disabled victims of Nazi persecution—and which has already distributed $6 million to over 50,000 needy survivors, especially Roma, *see* Special Master's Interim Plan, at 102— also reported on the current situation in the region:

> Eastern and Central Europe is a region where many persons, regardless of age or ethnic[ity], now endure daily living conditions which have worsened considerably since the end of communism. The elderly, and persons 'living on the edge' such as the Roma, have been hardest hit by the universal collapse of state services which once sought, however imperfectly, to meet some of their most basic material, social and medical needs.

Letter from Delbert H. Field, Jr., to Judge Korman, dated December 4, 2003. In other words, the "poverty [that] is nearly universal within these victim populations," Brandeis Report, at 44, is almost beyond comprehension.

The economic plight of survivors in the FSU is further revealed by examining the impact of the settlement funds already allocated to the Hesed network through the JDC. The settlement of this case, and in particular the allocation of funds from the Looted Assets Class, has been of tremendous aid. Contrary to Mr. Dubbin's unsupported and absurd suggestions that the Hesed centers did not need additional funding because "no such funds had been requested," *see* HSF Response, at 4, the settlement funds have in some sense saved the Hesed network. As private and international grants expired, funding to the Hesed centers was disappearing. *See* The American Jewish Joint Distribution Committee, Report on the First Eighteen Months of Welfare Programs in the Former Soviet Union, submitted to Judge Korman, July 31, 2003, at 7 (hereafter "JDC Interim Report"). The settlement funds "helped meet the shortfall." *Id.* The funds are allocated in such a way that spending is to be spread out over a ten-year period to insure that survivors will continue to receive support for the remainder of their projected life span, and in each year the money has gone a long way.

In the first 18 months after distribution began, 55% of the JDC's settlement funds budget of $10.875 million was spent on hunger relief programs, "a recognition that the relief of starvation and hunger is the core life sustaining program that Hesed programs must provide and remains the service needed by the most Nazi victims in the FSU." *Id.* at 13. As the Special Master wrote in his Interim Report, "[f]or these Nazi victims, funds from the Swiss Banks Settlement for many people have meant the difference between subsistence and hunger." Special Master's Interim Report, at 88. Specifically, the Hesed network used the money to provide food packages to 40,352 needy survivors and to serve over 2.2 million hot meals to 5,558 needy survivors. The food packages, which consist of non-perishable staples such as flour, pasta, rice, beans, sugar, oil and a protein source such as canned fish, are intended to be given to survivors eight times per year. JDC Interim Report, at 14. Because of a lack of funds, many survivors only received them on Rosh Hashanah and Passover. The hot meals were served only once a day, an average of four times per week, also because of a lack of funds. *Id.* at 16. Indeed, although hunger relief programs have been at the heart of the JDC's relief efforts and have by all accounts been a great help, these pro-

grams have still only benefitted 40% of the survivors served by the Hesed network. Approximately 60% of survivors identified as impoverished in the FSU have received no hunger relief benefit from settlement funds, despite desperate need.

Using the other 45% of its 18–month budget, the Hesed centers provided an average of four hours per week of home care assistance to 4,258 needy survivors; winter relief packages to 3,688 needy survivors; medical services to 19,118 needy survivors; and emergency grants worth approximately $50 each to 60,359 needy survivors. *See* JDC Interim Report, at 9, 19. These programs, like the hunger relief efforts, have been targeted at providing people with the barest necessities. The winter relief packages include basics such as fuel, blankets, and coats. And the home care assistance—which for these survivors is not available from any other source—is even more revealing. When Hesed workers visit survivors' homes they can assist in anything from meal preparation and supervision of medications to pumping well water and chopping wood. *Id.* at 18, 20. Without these services, which have only been made possible by the allocation of settlement funds, many in the FSU would not be able to survive the winter. But again, because of still limited funds, only a small fraction of the needy survivors served by the Hesed network (all 135,000 of whom are in desperate need) have received such a benefit.

While the overall level of destitution is explained by the statistics, examples may paint a clearer picture of the degree of suffering experienced by survivors in the FSU.

Rosa Zaitseva was 26 and pregnant when the Nazis first arrested her. Between 1941, when she attempted to flee Kiev ahead of advancing German forces, and 1944, when she was liberated by the Soviets, Zaitseva hid with her husband's relatives, languished in a ghetto, and fled to the forest, where soldiers shot at her from the trees. Her husband joined the partisans and disappeared, she gave birth to their daughter in a barn, and briefly changed her name to Nina to sound less Jewish.

After the war, she returned to Kiev to find her apartment destroyed, and married a cousin who was injured during the war and died in 1968. Their only son died 17 years ago, and Zaitseva's daughter, who lives in Russia, has been ill since birth.

Today, Zaitseva, 88, lives alone on the sixth floor of a rickety, Soviet-era building with pitch black elevators and unkempt hallways. Her pension is $30 per month. She is not recognized by the German government as a Holocaust survivor; in August 2000, the [Claims Conference, applying rules imposed by Germany,] turned down her request for assistance because she hadn't been imprisoned for at least six months in a concentration camp, prison camp, or forced labor battalion, and didn't spend at least 18 months in a ghetto, in hiding, or as a child under a false identity. Zaitseva, it seems, had fallen through the cracks.

Melissa Radler, *Acts of Kindness*, Jerusalem Post, October 19, 2003. Rena Zaitseva is not alone.

Take Meirke Stoler, now 87, of Radin (Soviet-occupied Poland at the time of the Nazi invasion of 1941, now in Belarus). He was incarcerated ... in the ghetto there, until May 10, 1942, when some 2,000 Jews, including his wife, his child and his mother were shot and buried in a big pit at the old Jewish cemetery. Mr. Stoler, then a blacksmith, was one of 50 young Jews taken at dawn to dig the pit. He escaped by hitting his

German guard over the head with a shovel and running into the forest..... [In 1999], Mr. Stoler had to send away the annual truckload of fuel to heat his wooden house over the winter, because it is now too expensive for him. His monthly pension comes to around $24 at the going rate. Things have gotten a lot worse since last year's collapse of the ruble in neighboring Russia, and like everyone else in these parts, his life's savings became worthless overnight back in 1991, when the USSR collapsed. Mr. Stoler had no idea that Holocaust compensation has become a hot topic in the West. He never received a penny in compensation and reacted with his usual jovial smile, in deep local Yiddish: "what am I going to do, find a big international lawyer here in Radin, ah?"

Dovid Katz, *How to Help the Holocaust's Last Victims*, The Forward, September 24, 1999 (cited in Plan of Allocation, at 124). These are just two of the 135,000 impoverished survivors, the overwhelming majority of whom have not benefitted from Germany's reparation plans (including the CEEF, which specifically targets a narrowly defined group of victims in the FSU), but who now might be saved from the brink of starvation and death by the Hesed network. Not all were reached in time.

> In 1943, [Yudel Nitzberg] and his family were deported from the local ghetto [in the FSU] to Auschwitz, where his father, mother, sister and brother were cremated alive. 'I always wear short sleeves,' he explained, pointing to the tattooed number 98987 on his arm, 'to make sure I never forget them for a minute. For better or worse, I have chosen to live and die right here, where my family lived for hundreds of years.' When asked what he needed to live well, his eyes lit up. The answer came without hesitation. 'We pensioners need an income of 100 American dollars per month per family. With that, we could live like Rothschild!' ... Nitzberg won't benefit from any such program. He died last year. Neighbors report that he was no longer able to afford the medicine that kept him going.

*Id.*

Serving these needy survivors has cost money, and will continue to cost money. Stuart Eizenstat correctly summarized the situation in reference to this case as follows:

> You have previously allocated 75 percent of looted asset money in the Swiss settlement (initially $100 million, increased by an initial interest amount of $45 million and then a second tranche of interest of $60 million, for a total of some $205 million) to victims in the former Soviet Union ... This has permitted the critically important distribution of food packages to some 135,000 survivors [actually only 40,000] in need in the CEE/FSU who have registered with the Hesed program of the American Joint Distribution Committee. **Nothing should be done to diminish this important program.**

Letter from Stuart E. Eizenstat to Judge Korman and Special Master Judah Gribetz, dated December 30, 2003 (emphasis added).

While the economic plight of survivors in the United States is less well documented, it is also clearly less pressing. Again, the best documentation we have for the economic position of United States survivors is the Brandeis Report, which consolidated findings from various studies. As support for his request for reconsideration, Mr. Dubbin, however, relies primarily on two of the principal surveys that informed the Brandeis Report's assessment of need in the United States. First is the NJPS, and

second is a study commissioned in 2002 to assess the level of need among survivors in the New York area, entitled "Nazi Victims in the New York Area." *See* Ukeles Associates, Special Report, Nazi Victims in the New York Area: Selected Topics, November 2003 (hereafter, "Ukeles New York Report"). I turn first to the NJPS.

The NJPS estimated that of approximately 122,000 survivors living in the United States, 53,200 live in households making less than $35,000 per year. It also estimated that 29,700 survivors (or nearly a quarter of United States survivors) are living in households that fall below the federal poverty line, which is an annual income of approximately $9,000 for a single person household, $12,000 for a two-person household, and $15,000 for a three-person household. *See* NJPS Draft, dated December 18, 2003, at 13; Poverty Thresholds, available at *www.census.gov.* Again, the NJPS figures are based on a telephone survey where 146 survivors were requested to tell a complete stranger their income over the phone. Under these circumstances, a more trustworthy and revealing finding almost certainly came in response to the question: How would you evaluate your household's financial situation? Of the survivors who responded to the NJPS questions, under 2% (or an estimated 2,100 survivors out of the entire survivor population in the United States) reported that they "can't make ends meet." NJPS Draft, dated December 18, 2003, at 13. Another 35% of those surveyed stated that they were "just managing," and 63% responded that they were either "comfortable," "very comfortable," or "wealthy." *Id.*

Part of the reason that all but a fraction of United States survivors who are ostensibly below or near the poverty line respond that they can make ends meet is that they have a social safety net on which to fall back. The researchers who prepared the Brandeis report "learned repeatedly that the lack of an adequate and effective social safety net in the FSU countries results in extreme hardship among Nazi victims." Brandeis Report, at 41. In the United States, however, should survivors find themselves in need, they can rely on the guarantees that living in America provides them. *See generally* Plan of Allocation, Annex F. The Special Master explained:

> In the United States, government entitlements generally assure a minimum income provided through the Social Security Administration. There also is an adequate level of health care provided through Medicare, a program designed to aid the elderly, and Medicaid, which supplements Medicare for needy elderly persons. These programs are intended to ensure that the majority of elderly residents maintain a sustainable, although hardly lavish, standard of living.

*Id.* at 8–9. Or, as the Brandeis Report concluded, while there is poverty among United States survivors, "[t]he undeniable fact ... is that the public and private social and economic protection systems to assist these groups and the normal process of adjustment reflecting the immigrant experience serve as buffers." Brandeis Report, at 46. Indeed, Joe Sachs, one of the founding members of HSF–USA and formerly Chairman of its Board of Directors, acknowledged that because of these buffers, poverty among United States survivors is less dire than Mr. Dubbin may claim. This is why he wrote: "As a Survivor and Board member of the Jewish Community Services of South Florida I am unable and unwilling to tolerate the inflated numbers of poverty stricken bandied about in the press." Letter from Israel J. Sachs to Judge Korman, dated January 15, 2004 (internal brackets omitted).

In 2000, according to the NJPS, 93% of survivors in the United States received

Social Security payments, including 99% of all survivors who immigrated before 1965 and 84% of all survivors who immigrated after 1965. NJPS Draft, dated December 18, 2003, at 9. The average monthly Social Security payment that year was $749 for an elderly widow living alone and $1,348 for a retired couple. *See* Plan of Allocation, Annex F, at 9. Medicaid is often paid to survivors on top of this sum, and it is significant. For example, New York state, where half of all United States survivors live, paid approximately $29.2 billion for Medicaid in 2002. *See* New York State Department of Health, statistics, available at *www.health.state.ny.us.* The average amount awarded to each beneficiary was over $13,080, and it often included home health care. *Id.* Indeed, over 75,000 individuals in New York received Medicaid assistance for home health services, and another 105,000 received assistance with transportation in 2000. *Id.* Notably, these Medicaid payments, along with non-cash benefits such as food stamps and housing subsidies, are not considered when measuring a family's income for determining whether they fall below the United States poverty line. *See* United States Census Bureau, How the Census Measures Poverty, available at *www.census.gov.*

Mr. Dubbin also argues that the Ukeles Associates' report on survivors in the New York area vindicates his objections because it bolsters the NJPS's conclusion that a large number of survivors in the United States are poor. In preparing the Ukeles Report, over 4,500 interviews were conducted with individuals in the New York area, revealing 412 Nazi victims. Ukeles New York Report, at 2. From this, the researchers estimated that over 55,000 Jewish Nazi victims live in the New York area, and that half live in households with incomes below 150% of the federal poverty line. *Id.* at 3, 5.

While the Ukeles study paints a distressing picture of Nazi victims in New York, one must bear in mind that these survivors have available an exceptionally strong social safety net that will generally prevent the kind of destitution faced by almost all of the survivors in the FSU. Because of this social safety net, the federal poverty line is simply not the correct measurement of whether a survivor can or cannot make ends meet. Indeed, this is why the NJPS estimate that only 2,100 survivors in the entire United States cannot make ends meet seems consistent with the Ukeles study. Again, I do not wish to make light of the need in the United States survivor community, but the need faced here is of a different kind than that faced by survivors in the FSU. A recent article in the Jewish Week that describes the plight of survivors who immigrate to the United States from the FSU highlights this fact, notwithstanding that the article was apparently intended to emphasize the economic difficulties faced by survivors. *See* Walter Ruby, *Victims Twice Over,* The Jewish Week, 1 (February 27, 2004). One of the survivors it focused on is named Faina Zaslavskaya:

> She and her husband live in Section 8 [subsidized] housing in Seagate, Brooklyn, not far from her children and grandchildren. Zaslavskaya says she and her husband receive a combined income from SSI of $950 a month— adequate for their modest needs because, unlike ex-Soviet refugees who arrived after them, they receive Section 8 assistance from the U.S. government that limits the amount of rent money they must pay to $180 a month. "Certainly we are grateful for the help we get, which affords us a better lifestyle than we would have in Russia." Zaslavskaya says. "Still, it hurts that many Americans think we take advantage of the system. They say things like, 'Look,

that woman is wearing a fur coat and gets food stamps,' not realizing that she brought the coat from Russia and it is likely the only one she has. They don't understand how difficult it is for us."
*Id.* at 16. Another of the survivors it focused on was a man named Felix Straschnov, "an evacuee who endured typhus and starvation in Kazakhstan during the war" and fought for the Soviet army. *Id.*

> Today, Straschnov lives in Brooklyn and is active in the American Association of Invalids and Veterans from the Former Soviet Union.... Straschnov and his wife scrape by on $950 a month in combined SSI, of which they have about $400 a month left after paying rent. 'I am grateful for what America has done for us, but it is sad that we will never be able to accumulate enough money to go back to Russia one last time to see the graves of our late parents,' he says. 'Many of us worry, too, that when we pass on, our wives will not have the means to provide us with a decent funeral.'

*Id.* And a third survivor was a woman named Fira Stukelman, who explained her plight as follows:

> Thank God none of us are hungry or homeless ... Still, life is very hard for most ex-Soviet survivors of Nazism. Those of us over 65 receive a check from SSI [Supplemental Security Insurance] for $651 a month, but how does a person make do on such an amount when the rent of even a studio apartment has risen to $900 a month or more? Yes, many get food stamps of $100 plus a month and Medicare and Medicaid, which helps a lot. Still, it is very sad people who endured such terrible things in their lives still face such a daily struggle to survive in old age in wonderful America.

*Id.* at 14. Each of these survivors almost certainly lives in a household whose income falls below the federal poverty line, and each endures hardship, but each may report that he or she can make ends meet because of the various benefits provided by the social safety net. These services are wholly unavailable to survivors still in the FSU—survivors who are therefore in no position to "thank God none of [them] are hungry or homeless." On the contrary, "relief of starvation and hunger is the core life sustaining program that Hesed programs must provide and remains the service needed by the most Nazi victims in the FSU." JDC Interim Report, at 13.

### 3. My allocation decision

When dealing with a finite sum of money, any allocation decision must be concerned with relative needs. I was compelled with the first distribution of $100 million, and the subsequent distributions of "excess" funds of $45 million and $60 million, to give 75% of the money to the source of the greatest need—survivors living in the FSU—and 4% of the money to survivors in the United States. Mr. Dubbin claims that my decision was based on a "seat of the pants" assessment by the Special Master that bears no relation to demographic data. HSF Response, at 12. Anyone who takes the time to read the Special Master's studied and comprehensive Plan of Allocation will know that this was as thoughtful and careful an allocation as could have been made. It was a concerted effort to quantify conditions that inherently resist a numerical assessment. Indeed, the fact that Mr. Dubbin calls it a standardless "seat of the pants" assessment leads me to wonder whether he has ever read the Plan of Allocation. Because of the extensive justification provided in the Plan of Allocation, I need not enter into a strict numerical debate defending the specific distribution of Looted Assets

Class funds. However, because Mr. Dubbin is apparently so concerned with numerical standards, I will briefly address the debate on Mr. Dubbin's terms.

Of the Looted Assets and excess funds, I have thus far allocated to needy survivors in the FSU 18.75 times the amount I have allocated to needy survivors in the United States. If I were to assume that every needy survivor deserved the same amount of money, that would mean that there should be 18.75 times more needy survivors in the FSU than there are in the United States. There are at least that many. The JDC has clearly documented at least 135,000 survivors in the FSU who are in desperate need, more than the entire survivor population in the United States. Thus, even in Mr. Dubbin's terms, the 18.75 number would be subject to challenge only if there were more than 7,200 survivors in the United States who are in comparable distress. The empirical evidence that has been produced has not identified 7,200 such people.

Mr. Dubbin, recognizing that not all survivors at or near the poverty line are experiencing a level of distress sufficient to warrant payment, only claims to have identified 4,000 needy survivors in the United States—equating "need" with home care and related services. He claims (with no support) that up to 8,000 more will be identified through outreach. But if I rely on the NJPS Draft study, the number may be as low as 2,100 people, as this is the estimated number of people who "can't make ends meet." NJPS Draft, dated December 18, 2003, at 13. Even if I accept the affidavits Mr. Dubbin submits in support of his argument, the number of total needy survivors in the United States may only be between 2,800 and 5,600. This estimate would be consistent with the declaration of David Paikin, Senior Vice President of the United Jewish Community of Broward County, Florida, who wrote in support of the HSF–USA proposal. *See* Motion for Immediate Distribution, at Tab 5. Mr. Paikin explained that there are between 5,000 and 10,000 survivors living in Broward County, up to 230 of whom may need additional home health care (Mr. Dubbin's apparent proxy for need in the United States). *Id.* This still represents only 2.3% to 4.6% of the survivors in Broward County, Florida, a state with one of the least extensive social safety nets in the country. Taking this level of need as representative—in fact, it is probably higher than average given the low level of public assistance provided by the state of Florida—one would expect to find between 2,800 and 5,600 survivors nationwide requiring home health care.

In sum, Mr. Dubbin has produced no evidence to undermine the percentage allocation reached by the Special Master, and adopted by me. Instead, the empirical evidence supports my decision. Notwithstanding this, I now turn directly to Mr. Dubbin's objection and proposal, as he questions not merely my identification of needy survivors, but my method of identification.

## 4. Mr. Dubbin's objection and proposal

Mr. Dubbin concedes that the *cy pres* allocation to the Looted Assets Class should not be distributed *pro rata* among each of the members of the Class (a class which includes all survivors and their heirs). Indeed, he apparently agrees that the money should be given to the neediest survivors. But he objects to my decision to give only 4% of the funds to needy survivors in the United States. Given the distribution of need outlined above and described more extensively in the Special Master's Plan of Allocation, and given the total lack of contradictory demographic

data produced by Mr. Dubbin, this objection is frivolous.

Instead of trying to determine a way to equally distribute a finite sum of money to the neediest of *all* survivors, Mr. Dubbin's objection proceeds from the premise that geography should be the controlling factor. He argues that needy survivors in the United States should be awarded 25% of the funds because approximately 25% of survivors live in the United States. Mr. Dubbin provides no demographic support for his claim that 25% of all survivors live in the United States. This figure is inconsistent with prior surveys and Mr. Dubbin has apparently abandoned in favor of 20% in his most recent proposal for the distribution of residual funds. *See* Plan for Providing Assistance for Needy Nazi Victims in the United States Submitted by HSF–USA, dated January 30, 2004, at ¶ 27, available at *www.swissbankclaims.com.* I will not waste time addressing its veracity. The precise percentage of survivors living in the United States is irrelevant for the purpose of dealing with Mr. Dubbin's objection. Mr. Dubbin's objection is frivolous because there is no Looted Assets Class sub-class composed of United States survivors. The relevant sub-class is the Looted Assets Class itself, and it is composed of *all* victims of Nazi persecution *and* their heirs whose assets were looted by the Nazis. It is not subdivided geographically. There is no "U.S. Survivors' share." HSF Response, at 15. To the contrary, the only way survivors in the United States would be entitled to 25% of the funds from the Looted Assets Class would be if they showed that 25% of the most pressing need among Jewish survivors globally was in the United States.

Mr. Dubbin even argues that, "if the present allocation scheme is not corrected, the settlement would violate Rule 23, because it would compromise the Looted Assets claims of the U.S. Survivor community for virtually no consideration." *Id.* at 18. He continues: "[N]o goal, not even the increase in the total settlement fund can justify a settlement that eliminates *the rights of one sub-class of plaintiffs* in order to confer a benefit on another subclass." *Id* (emphasis added). Again, because there is no sub-class of United States survivors, this claim is baseless. The percentage of survivors who live in the United States is irrelevant for my distribution decision because all survivors are members of the same sub-class—the Looted · Assets Class. There are no further divisions, by geography or otherwise. As Professor Neuborne has written: "Mr. Dubbin's effort to drive legal wedges between and among Holocaust survivors based on where they live is therefore simply wrong as a matter of law and policy." Supplemental Neuborne Declaration, at ¶ 38.

The only relevant question is what percentage of the *need* among all survivors can be found in the United States. According to demographic data set forth above, data that Mr. Dubbin has yet to refute, only a small fraction of the neediest survivors live in the United States. Mr. Dubbin would provide these relatively few needy survivors with a disproportionate benefit solely because of the overall size of the survivor community in the United States. Such an allocation is arbitrary and unreasonable. Its flaws are better understood by a detailed look at Mr. Dubbin's proposal.

Mr. Dubbin has put forth only one "concrete" proposal, first presented in connection with his objections to the Special Master's recommendation on how to distribute the first allocation of excess funds, and resubmitted now. *See* HSF Objection to Allocation of Interest; Motion for Immediate Distribution, Tab 4. The proposal, enti-

tled "Proposal for Improved Services for Holocaust Survivors in the United States," was prepared by Bert Goldberg, President of the Association of Jewish Family & Children's Agencies (AJFCA). While Mr. Dubbin continues to refer to this HSF–AJFCA Proposal, he apparently recognizes its own shortcomings. Indeed, if this proposal were ready to be implemented, there would be no need, when calling for the "immediate distribution" of funds, for him to demand that the funds be placed "in trust to be spent in accordance with the decisions of a committee of HSF survivors," representatives of other organizations, and "the Court." Motion for Immediate Distribution, at 1 n. 1. Regardless, I consider the proposal as a part of Mr. Dubbin's objection and as evidence of its flaws.

The HSF–AJFCA proposal is riddled with vague assertions and unsupported estimates, but at core, it is a proposal that would give 25% of the funds allocated to the Looted Assets Class to, *at most*, 12,000 survivors in the United States for supplemental home health services. Mr. Goldberg claims that approximately 4,000 identified survivors are already receiving considerable but insufficient aid from Jewish human services agencies, and 8,000 more could be identified by an outreach program. He would like to provide more complete home health services to this group. To implement this proposal, Mr. Dubbin demands $30 million annually, of which he claims $10.5 million is needed for home care services for the already identified needy survivors; $3 million is needed for emergency services; $3 million is needed for transportation services; $3 million is needed for outreach; and $10.5 million is needed for services to those survivors who would be newly discovered as needy through the outreach. Motion for Immediate Distribution, Tab 4, at 7.

First, Mr. Dubbin's $30 million per year budget cannot be reconciled with the limited funds available for distribution. As explained earlier, Mr. Dubbin has demanded that out of $200 million he has proposed be reallocated to the Looted Assets Class, $50 million be set aside for "immediate distribution" to survivors in the United States. This $50 million sum is based on the premise that 25% of all survivors reside in the United States—an estimate that he has already reduced to 20%. Even if I were to grant this "immediate distribution" of $50 million it would only be sufficient to pay for less than two years of his proposal (and a still shorter span if the sum were reduced to $40 million to correspond with the concession that closer to 20% of survivors reside in the United States). Under his proposal, there would be no money for assistance programs necessary to provide needy survivors with assistance over time. As the Special Master wrote in his Plan of Allocation: "Social services needs that appear imperative today may diminish in a few years' time, while other demands not yet anticipated—especially with an aging population—may later arise." Plan of Allocation, at 136. Indeed, this is why he advised that, "there should be a presumption that funding of these recommended social services programs will be maintained for a period of up to ten years." *Id.* Mr. Dubbin apparently sees no need for such continuity.

Second, Mr. Dubbin's identification of need is unreasonably vague. Specifically, Mr. Dubbin proposes allocating these funds to the HSF in conjunction with the AJFCA for the benefit of the approximately 4,000 survivors in the United States whom Mr. Goldberg claims have been identified as being in poor health and in need of home care and related services. *See* Motion for Immediate Distribution, Tab 4. The problem with relying on the estimate of 4,000 individuals is that by his

own admission, Mr. Goldberg does not know whether they all actually need more assistance than they are already receiving. Indeed, Mr. Goldberg describes the 4,000 individuals he has "identified" as follows:

> Approximately 4,000 individuals currently receive in-home services provided either directly by the Jewish human service agency in their community or by referral and paid for by the local agency. It should be noted that, in addition to services made available by funds supplied from Jewish communal resources, home care for the elderly is provided (or not provided, depending on the state) with funds provided by Medicaid and/or Medicare. It bears note that, in some cases, these services are purchased on the 'gray market,' from non-licensed and unsupervised providers, or from agencies that are not part of the Jewish communal network. In addition, frequently, family members provide some or all of the services needed. **All of these factors make it extremely difficult to obtain a definitive estimate of the home care needs.**

Motion for Immediate Distribution, Tab 4, at 3 (emphasis added).

Thus, it seems clear that at least some number of the 4,000 identified individuals receiving home care and related services from the Jewish human services agency in their community are also receiving services from other sources. Nevertheless, this soft and speculative number becomes the basis for Mr. Goldberg's estimate of how many survivors are in need of settlement funds. Specifically, Mr. Goldberg claims that these 4,000 individuals are only "half" of the needy survivors in the United States. Mr. Dubbin then demands that I fund an outreach program through which Mr. Goldberg claims his Foundation could find 8,000 more. *Id.*, at 7. Either Mr. Goldberg is careless with his words or

poor with his math, because this makes no sense. It is also irrelevant. Neither Mr. Dubbin nor Mr. Goldberg has produced any concrete evidence to substantiate the estimate that their agencies could locate 4,000 or 8,000 such survivors. Indeed, the only support for the proposed outreach program is the following conclusory statement: "Agencies further report their belief that they currently know of only half the survivors in need of services in their community." *Id.* This unsupported "belief" is hardly enough to warrant an allocation of $13.5 million annually, Mr. Dubbin's estimated cost of the outreach program and services to the newly identified survivors. While not all studies are infallible, Mr. Dubbin has yet to present a single one to substantiate his projected outreach estimates.

A more revealing estimate of the likely success of Mr. Dubbin's outreach program is provided by Mr. Paikin, who submitted a declaration in support of Mr. Dubbin's proposal, which I discussed earlier. *See* Motion for Immediate Distribution, at Tab 5. To reiterate, Mr. Paikin explained that there are between 5,000 and 10,000 survivors living in Broward County and that in June 2003, 106 were receiving (not merely in need of) home health care. *Id.* He estimated that given recent trends of needy survivors coming forward, that number could increase to 230 with additional funding and outreach. *Id.* Assuming that this percentage of survivors needing home care is representative of the nationwide survivor population, between 2,800 and 5,600 survivors nationwide require home health care. Many of these survivors, of course, may be able to pay for their required services without resort to settlement funds, and many—particularly those not living in Florida—will be able to receive public assistance. Mr. Paikin's estimate, along with the surveys set out earlier, thus suggest that Mr. Goldberg, faced

with what he acknowledges are "factors [that] make it extremely difficult to obtain a definitive estimate of the home care needs," has submitted a proposal based on mere guesswork—not the kind of proposal that justifies the expenditures sought.

Mr. Dubbin's objections to the assistance of desperately needy survivors in the FSU may be rooted in the apparently differential views as to survivors of the Holocaust held by those who make up HSF–USA. As I stated at the outset, comparing different populations of survivors is by definition an odious process. Some of the groups that claim to be members of HSF–USA have made the process no easier by repeatedly suggesting that the survivors living in the FSU (or by the same logic, former FSU survivors who have immigrated to Israel and the United States) are not "true survivors." For example, Leo Rechter, one of the founding members of HSF–USA and now its Secretary, wrote:

> Most Jews currently residing in the FSU never saw a Nazi uniform. As you know, by the time the Nazis invaded Russia, they used 'Einsatzgruppen' to kill most of the unfortunate Jews they captured. In the communist FSU, most of those that fled eastward were able to take their most precious belongings along and did not own the real-estate they left behind. The destitute elderly Jews in the FSU are victims of the ravages of WWII (like many non-Jews in the civilian population) and of the failed communist economic system and they ought to get as much charitable assistance as possible. But by no stretch of the imagination can they be considered to be legitimate members of the 'Looted Assets' Class or any other Class.

Letter from Leo Rechter to Professor Neuborne, dated July 22, 2002.

I have already refuted this claim by providing Mr. Rechter with a study, entitled "Plunder of Jewish Property in the Nazi Occupied Areas of the Soviet Union," by Yitzhak Arad, a researcher on the Holocaust for the International Center for Holocaust Studies at Yad Vashem. *See* Letter from Judge Korman to Leo Rechter, dated September 23, 2002 (enclosing study, available at 29 Yad Vashem Studies 109–48 (2001)). Indeed, in proposing his recommendations for the Looted Assets Class, the Special Master explained in considerable detail that as was "true for Nazi victims across Europe, Jews in the former Soviet Union who lived in, owned property in, or fled from areas under Nazi occupation lost virtually all of their material possessions to the Third Reich's plunder, which in Eastern Europe was led by the notorious *Einsatzgruppen*, often assisted by the local population." Plan of Allocation, at 123. The "Looted Assets Class" annex to the Plan of Allocation (Annex G) made it clear that "Nazi victims' assets, and particularly those of Jews, were plundered with abandon and without precedent across all nations, all economic classes, and without regard to the ultimate fate of the victim—whether that victim was murdered in an extermination camp or work camp, or fled abroad to the East." Plan of Allocation, Annex G, at 3. The Annex provided numerous historical examples demonstrating that those living in the former Soviet Union and other Eastern European countries were no less exempt than Western Europeans from Nazi plunder. *See id.*, at 15 (describing recent research by United States Holocaust Memorial Museum scholar Dr. Martin Dean, documenting transfer to the Reichsbank of assets from Belarus, Ukraine, Lithuania and elsewhere; Dr. Dean's research paper tellingly is entitled "Co-operation and Rivalry: Civil and Police Authorities and the Confiscation of

Jewish Assets in the Reich and the Occupied Soviet Territories").

Despite the Plan of Allocation and my letter enclosing the Arad study (research which was published after the Plan of Allocation was adopted), HSF–USA apparently remained unconvinced. When Mr. Dubbin initially submitted his $30 million per year proposal, he wrote, in deference to the views of the groups making up HSF–USA:

> The HSF Survivors assume for purpose of this Objection the correctness of the Special Master's conclusion that the Victims of Nazi Persecution in the Former Soviet Union [are] qualified members of the Looted Assets Class. *See, e.g.,* Special Master's Report at 23–6, and Annex G, at G–6 and G–7. The Court understands that differences of opinion exist on this question, but that they· are not discussed in this request.

Objections, dated September 27, 2002, at 11 n. 11. This sort of backhanded suggestion has no place in the distribution process. Or, in the words of The Forward: "Some in the group [HSF–USA] reportedly have had the effrontery to suggest that Holocaust survivors in the former Soviet Union aren't necessarily Holocaust survivors, since many avoided the Nazis by fleeing to Siberia. That's outrageous." Editorial, *Justice Delayed, Peevishly,* The Forward, September 13, 2002. All who suffered and lost assets are equal members of the Looted Assets Class. The only difference relevant to the distribution process is their current level of need.

Mr. Dubbin's hesitation in acknowledging that survivors in the FSU are true survivors is also inconsistent with his current position and raises serious questions regarding the claim of HSF–USA that it represents all needy survivors in the·United States. The overwhelming majority of the most needy survivors in the United States are recent immigrants from the FSU. And Mr. Dubbin must surely recognize that the survivors still·in the FSU are the same as the survivors who he inevitably ·embraces as "true survivors" once they immigrate to the United States and who, by consistently being among the neediest survivors in America, bolster his claim that the survivor community in the United States is in desperate need. Indeed, as the Brandeis Report concluded, in "the United States, poverty rates are especially noteworthy among recent immigrant victims from the FSU." Brandeis Report, at 44. Or in the words of the Ukeles study, "Nazi victims in Russian-speaking households are much more likely to be poor [81% as compared to 21%] than Nazi victims in non-Russian-speaking households." Ukeles New York Study, at 6. This is not because individuals living in Russian-speaking households cannot succeed in New York; it is because 67% of those in Russian-speaking households have arrived in the United States since 1990. *Id. Essentially, the fact of being a recent immigrant from the FSU is the best predictor of poverty for survivors in the United States.*

· Finally, Mr. Dubbin makes two more outlandish claims on this score that warrant additional comment. First, Mr. Dubbin has argued that the allocation formula I have employed thus far "constitutes, in the eyes of the American Survivor community, a de facto exercise of charity using their money." Letter from Samuel Dubbin to Judge Korman, dated October 29, 2002, at 4. Setting aside the fact that, as I explained earlier, the money is not "their money," Mr. Dubbin must recognize that this objection is inconsistent with his own proposal. Mr. Dubbin would take money that he claims belongs to the American Survivor community and give it to *at most* 12,000 individuals, or less than 10% of its estimated 122,000 members. Indeed, although the number of survivors in the

United States living below the poverty level has been estimated at 30,000, the overwhelming majority of them would not benefit from Mr. Dubbin's proposal. It is hard to see how this proposal would survive Mr. Dubbin's own objection to the Special Master's Plan of Allocation as coercing charity.

Second, Mr. Dubbin argues that "had the Special Master's Initial Allocation Plan [to give United States survivors only 4% of the money] been published *prior to* the time the Class members had an opportunity to opt out, there would have been a massive opt out by Looted Assets Class members from the United States—over 100,000 members of the Settlement Class," which he maintains "would undoubtedly have threatened if not destroyed the settlement itself, as the Swiss Banks would likely not have tolerated the exodus of one-fifth of the settlement class despite the supposed 'weakness' of the looted assets claims." HSF Response, at 19–20.

The "mass opt-out" argument, like the "charity" argument, could apply with equal—or greater—force to Mr. Dubbin's proposed plan of allocation, a plan that would exclude 90% of the survivors in the United States from any share in the *cy pres* distribution to the Looted Assets Class. The basic fact is that each of the legal objections Mr. Dubbin makes to the Special Master's plan of allocation applies equally to his own proposal, because both plans accept the premise that the limited funds available for distribution should go to the neediest members of the Class. This premise is legally sound and morally justified. Mr. Dubbin's proposed application of it is not.

More significantly, Mr. Dubbin's "mass opt-out" claim ignores the fact that the United States survivor members of the Looted Assets Class are very often members of each of the other sub-classes as well (except for the relatively small Slave Labor II Class). The benefits directly paid to over 151,000 Jewish survivors worldwide (or, in the case of bank accounts, heirs) from these three *other* classes—Deposited Assets, Slave Labor Class I and Refugees—total over $358 million to date. Nearly 37,000 survivors living in the United States have received over $107 million of that sum. In other words, U.S. survivors have received approximately 29.9% of all settlement funds distributed to date. Had they opted out and pursued the novel legal theories underlying the case on an individual basis, they likely would have received nothing.

By contrast, the desperately poor survivors in the FSU, who lack the bare necessities of life and who were victims of Nazi persecution, receive next to nothing from their membership in the Deposited Assets Class, Slave Labor I Class or Refugee Class. They were living under communism and most did not have access to Swiss Banks, most did not seek refuge in Switzerland, and many were not Slave Laborers. Even though they suffered terribly as a consequence of the Nazi onslaught and lost whatever they had, the only significant benefit they receive from the Settlement Agreement is from the *cy pres* allocation for members of the Looted Assets Class. One could easily argue that without such an allocation, they would have had much more of an incentive to opt-out than survivors in the United States. Mr. Dubbin apparently overlooked this fact (along with seemingly all of the other facts relating to the survivors in the FSU) when making his argument.

Mr. Dubbin has written: "If continued into the future at [the current allocation formula] with an additional $500 million likely to come available, the FSU would receive a total of $528 million, Israel would receive a total of $87.5 million, and the

U.S. would receive $28.3 million for the needs of Survivors here. Though such an outcome seems fantastical, the U.S. Survivors have seen nothing in this case to suggest it is not a distinct possibility." HSF Response, at 11 n. 8. I do not address here the issue of how future funds will be distributed. This is partly because I specifically gave the public the opportunity to submit sound, *concrete* proposals to guide my decision. First the Special Master will review the proposals and make a recommendation. Then I will hold a hearing and make a decision. If, after reviewing the many proposals submitted, the "fantastical" outcome that Mr. Dubbin fears proves to be how the needs of the class are best satisfied, there would be nothing fantastic about it. It would be an honest and tragic reflection of current levels of need.

### Part II: The Standing of HSF–USA to object

■ I turn now to the question of whether HSF–USA even has standing to bring these objections. HSF–USA relies on the principle that a membership corporation has standing to litigate on behalf of its members. While HSF–USA does not number any needy victims of Nazi persecution among its own members, it argues that some of its constituent entities have such victims among their membership and that this confers standing on HSF–USA to litigate on behalf of these individuals. I have reviewed the Certificate of Incorporation of the HSF–USA and its by-laws. My reading of these documents suggests that HSF–USA is not a membership corporation even though Article 4 of the Certificate provides that "[t]he Corporation may have members if the Board of Directors determines that it would be in the best interest of the Corporation to do so." The Bylaws of HSF–USA state in relevant part: "The Corporation should have a special class of members referred to as 'Founding Members.' The Founding Members should consist of the initial Board of Directors of the Corporation, and Thomas Weiss, M.D."

While the Memorandum of Law submitted by HSF–USA alleges that it is "comprised of Survivors and Survivor groups that are membership organizations which function in many capacities for Survivors today," Response of Holocaust Survivors Foundation–USA, Inc. on Standing Issues at 3 (hereafter "HSF Standing Response"), and that "there *are* a large number of Survivors who are part of HSF and its member organizations," *id.* at 6, not a single affidavit or corporate document has been submitted that establishes that any organization has been elected to membership in HSF–USA by the Board of Directors. Under these circumstances, HSF–USA cannot invoke the principal that, under certain circumstances, "an association has standing to invoke the court's remedial powers on behalf of its members." *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (quoting *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

Moreover, even if some of the groups that are said to "comprise" HSF–USA had been elected to membership and might individually have standing to object on behalf of their members, HSF–USA would lack such standing. As Professor Neuborne wrote:

I question .... whether in the circumstances of this case, Rule 23 or the prudential aspects of Article III standing authorize such a self-described umbrella organization to purport to act on behalf of unnamed individuals who are allegedly members of one or more of 50 constituent organizations, without producing any evidence that the individuals are aware of the action, and have au-

thorized its prosecution. Allowing counsel for such a self-appointed umbrella group with no members of its own to purport to assert the legal rights of alleged members of constituent organizations without producing proof that individuals with standing actually exist who wish the action to proceed virtually invites entrepreneurial lawyers to claim to represent individuals who may not exist, who have never heard of the lawyer, and who, in fact, disagree with the position asserted.

Moreover, whatever the general rule concerning the role under Rule 23(e) of organizations purporting to represent categories of class members without their explicit assent, the particular circumstances of this case argue strongly against recognizing the status of HSF as a self-appointed legal proxy for unnamed members of its constituent groups. Where, as here, the interests of the alleged beneficiaries of the HSF challenge are already adequately protected by careful submissions to the Court by established organizations such as United Jewish Communities and New York City Federation, organizations that actually provide services to the individuals in question, I question whether it is appropriate to accept a legal challenge from such a self-designated group in the absence of explicit authorizations from the alleged individuals whom HSF claims to represent, especially when HSF is represented by an attorney who has already sought to exploit the settlement by unsuccessfully seeking unreasonably large legal fees for providing alleged services to the plaintiff-class on behalf of another client, and whose pursuit of a meritless and ultimately abandoned appeal on behalf of that client actually delayed the distribution of funds to the Looted Assets class for at least six months.

Affirmation of Burt Neuborne, dated February 20, 2004.

Finally, HSF–USA would lack standing because it cannot be presumed that any of the organizations which HSF claims as "members" would themselves have standing. I have thus far assumed, for the purpose of addressing the standing issue, the validity of the premise the Special Master used in formulating the plan of allocation—namely, that all survivors are members of the Looted Assets class. The Special Master adopted this presumption for allocation purposes because it would be impossible for any survivor to satisfy the necessary criteria for membership in the class. But as the Special Master explained in his original proposed plan of allocation:

> The Settlement Agreement indicates that only those who have asserted or may assert claims against a Releasee can claim membership in the "Looted Assets Class," i.e., that only those "Victims or Targets of Nazi Persecution" who were looted, and whose stolen property actually or allegedly was sent to or through Switzerland or Swiss entities, are entitled to participate in this Settlement.

Plan of Allocation, at 111.

As I explained in Part I above, the Special Master correctly observed that while it is well accepted by historians, including those representing Switzerland, that a primary purpose of the Nazi plunder was to transform loot (especially, but not only gold) into foreign currency by marketing these items in neutral nations, including Switzerland, determining "[w]hich particular looted item may have ended up in Switzerland ... is a far different matter." *Id.* at 114–15. "Were the Special Master to recommend that each [looted assets] claim be assessed individually ... the result would be an unwieldy

and enormously expensive apparatus to adjudicate hundreds of thousands of claims, for losses which can barely be measured and hardly documented, *and whose connection to Switzerland, or a Swiss entity, if it ever existed, probably no longer can be proven.*" *Id.* at 115 (emphasis added).

While these and other considerations led the Special Master to treat all survivors as Looted Assets Class members for the purpose of devising a rational plan of allocation, it does not follow that every survivor should be treated as a member of the Looted Assets Class for all purposes. Simply stated, a survivor who seeks to assert objections to the Special Master's Plan of Allocation must still show that he or she has standing as a result of a direct injury that brings him or her within the true definition of the Looted Assets Class. Of course, the same showing must be made by a membership corporation seeking to litigate on behalf of such a survivor.

In sum, I find the HSF–USA has no standing in this case. Nevertheless, I would not lightly ignore objections that have compelling merit, even if made by an *amicus curiae.* The HSF–USA objections have no merit.

### Part III: Mr. Dubbin's Fee

■ Finally, because I have ruled on Mr. Dubbin's various proposals, motions and objections, it is appropriate here to dispose of Mr. Dubbin's outstanding fee application. Two years ago, Mr. Dubbin submitted a fee application that was almost equal to the total amount of legal fees awarded to those counsel who were compensated for their role in obtaining the $1.25 billion settlement with the Swiss banks. Specifically, Mr. Dubbin requested $3.6 million in fees and compensation for himself and an additional award of $2,315,250 for Dr. Thomas Weiss, a founding member of HSF–USA. *See* Verified

Motion for Attorney's Fees and Expenses, dated March 15, 2002 (hereafter "Motion for Mr. Dubbin's Fees"); Declaration of Thomas Weiss, M.D., dated May 16, 2002. Mr. Dubbin also sought expenses in the amount of $70,260.87. *Id.* Of the total $5.9 million that Mr. Dubbin seeks, approximately $3 million is for his efforts on behalf of HSF–USA and its predecessor, the South Florida Holocaust Survivors Coalition, with respect to his objective described in the earlier parts of this opinion—namely, his effort to rectify the allegedly disproportionate sum allocated to survivors in the United States. The remaining $2.9 million, of which Mr. Dubbin seeks $600,000 for himself and $2.3 million for Dr. Weiss, who was Mr. Dubbin's client, is for services rendered in connection with Dr. Weiss's objection to the releases granted to Swiss insurance carriers as part of the global settlement of all claims against Swiss business entities. I will address the latter request for counsel fees in a separate opinion, to follow shortly. Here, I reject outright Mr. Dubbin's request for $3 million as it relates to the subject matter of this opinion.

I begin by observing that this fee request is for services rendered as of March 15, 2002—before the submission of the various proposals, objections and motions discussed above. Because I have rejected each of Mr. Dubbin's claims, it seems obvious that since that date, he has accomplished nothing in relation to his efforts to correct the supposed imbalance in the allocation of funds to the Looted Assets Class. This allows me to briefly deal with Mr. Dubbin's $3 million fee request for his work prior to the filing of his fee application.

I read carefully Mr. Dubbin's affidavit in support of his fee application. While I am prepared to accept for present purposes that he may have expended time and effort

to obtain assistance from various sources for his clients, the Settlement Fund was not set up to pay legal or other expenses of survivor groups. If Mr. Dubbin is entitled to compensation from the common fund, it must be for benefits conferred on members of the Looted Assets Class, and more specifically, benefits associated with his professed goal of achieving a different distribution of funds allocated to the Looted Assets Class. After all, "[t]hose who receive no benefit from the lawyer's work should not be required to pay for it." *Van Gemert v. Boeing, Co.*, 573 F.2d 733, 736 (2d Cir.1978).

The following is a brief summary of what Mr. Dubbin in fact did before filing his fee application with reference to the issues discussed in this opinion. After I approved the Settlement Agreement on August 9, 2000, Mr. Dubbin filed a notice of appeal on behalf of Dr. Weiss. Prior to the filing of Dr. Weiss's notice of appeal from the judgment approving the settlement, I had a telephone conference with Dr. Weiss, Mr. Dubbin, and Professor Neuborne in which I attempted to dissuade Dr. Weiss from filing the notice of appeal. This conference is pertinent to Dr. Weiss's and Mr. Dubbin's effort to rip off an additional $2.9 million for the objections to certain releases granted to Swiss insurance carriers, which I will address in depth in a separate opinion. Now, I add only that Dr. Weiss demanded that I provide money to fund private research for a separate litigation in exchange for his not filing a notice of appeal. I refused.

Subsequently, Mr. Dubbin filed a notice of appeal on behalf of Dr. Weiss and others from my approval of the Plan of Allocation. After months of delay arising from Mr. Dubbin's difficulties in perfecting the appeals, Professor Neuborne and I met with Mr. Dubbin and Dr. Weiss. We pointed out that both appeals were without merit, but because distribution could not begin until all appeals from the order approving the Settlement Agreement were resolved, the presence of the first appeal could further delay the commencement of distribution. Approximately one week before Mr. Dubbin's appellate brief was due, Mr. Dubbin withdrew both appeals with prejudice having never filed a brief. Nevertheless, several other appeals from my order approving the Settlement Agreement remained, and the Court of Appeals did not affirm the judgment approving the Settlement Agreement and the Plan of Allocation until July 26, 2001. *See In re Holocaust Victim Assets Litig.*, 14 Fed. Appx. 132 (2d Cir.2001).

Mr. Dubbin claims that despite the withdrawal of his appeals, his efforts created a tangible benefit to American members of the Looted Assets Class that warrants $3 million in legal fees. Specifically, he points to a two-page letter that Professor Neuborne wrote after Mr. Dubbin withdrew his appeal. Mr. Dubbin describes this letter as follows:

> The compromise of the Appeals resulted in the valuable benefit to the American Survivors of the Lead Plaintiffs' Class Counsel's commitment to support an allocation to the American Survivor community from funds remaining after the initial allocation (estimated by Professor Neuborne to be between $100 and $400 million) in their fair proportion of the world Holocaust Survivors population, and with due regard for the fact that they have not received significant allocations up to this point (less than 1%), This represents a potential additional value of between $25 million and $100 million or more. . . .

> Although the Court has not ruled on any secondary distribution, the Lead Plaintiffs' Class Counsel's commitment, in a matter where the Defendants have *no*

stake in how the remaining funds will be allocated, as enormous tangible value to the American Survivors, and was a direct result of the work Counsel did on their behalf up to and through the resolution of the Appeals.

Motion for Mr. Dubbin's Fees, at 62–63.

While Mr. Dubbin cites other benefits that he claims derive from Professor Neuborne's letter, *see id.* at 63–64, I can now state with certainty that those potential or intangible "benefits" amounted to nothing in terms of a direct benefit to the members of the Looted Assets Class. This is due in part to the flawed premise that needy survivors in the United States were not treated fairly, and in part to Mr. Dubbin's failure to submit a viable home and health care program or other proposal for Mr. Neuborne to support. Mr. Dubbin never undertook any serious effort to provide empirical evidence to support his claim that needy members of the Looted Assets Class who reside in the United States were being treated unfairly. In the end, he never impacted any distribution decisions. By contrast, the lawyers who sought compensation for obtaining the $1.25 billion settlement personally risked some $432,500 for litigation expenses, a substantial portion of which went toward original research that ultimately had a major impact on the success of their clients' settlement negotiations. One of these attorneys, Robert Swift, alone contributed over $100,000 to this effort. He was awarded a fee of $1.25 million. *See In re Holocaust Victim Assets Litig.*, 270 F.Supp.2d 313 (E.D.N.Y.2002). This is how class action lawyers who know what they are doing litigate, and this is how they win their fee.

In any event, I now turn to Professor Neuborne's letter, which Mr. Dubbin argues is worth $3 million in legal fees. The principal problem with this letter as the basis for Mr. Dubbin's fee application is

that it only obligated Professor Neuborne to support certain proposals. It would have provided a benefit to members of the Looted Assets Class whom Mr. Dubbin claims to represent *only* if it achieved in some tangible way the objective of rectifying the alleged unfairness in the Plan of Allocation. This did not occur. Specifically, Professor Neuborne wrote:

In connection with the [expected] secondary distribution, I have a great deal of sympathy with the argument that **the needs of poor survivors in the United States should be carefully considered.** I will support thoughtful plans designed to assure that the needs of the American survivor community are addressed, with resources in a fair proportion to their overall numbers, and with due regard for the fact that they have not received significant allocations up to this point. I would be delighted to support a serious, realistic plan for providing home and health care to needy survivors in the United States.

Letter from Professor Neuborne to Samuel Dubbin, Esq., dated May 15, 2001 (emphasis added). Read closely and in context, Professor Neuborne pledged to support plans designed to address the *needs* of the American survivor community in proportion to their overall numbers. Indeed, this is what he has done.

This pledge was simply a statement of Professor Neuborne's commitment to fairly represent the class as a whole, and is consistent with the policies underlying the *cy pres* distribution outlined in the Plan of Allocation. As Professor Neuborne explained, in writing to Mr. Dubbin:

You were repeatedly informed by me and by Judge Korman that the letter carried absolutely no legal consequences. I accepted the anodyne language because I agreed with it. I stand by it today. In connection with any

distribution of unclaimed funds, I support a careful consideration of the needs of poor survivors in the United States. I support allocations that correspond fairly to the number and plight of the poorest survivors in the United States. I support plans to provide the necessities of life to needy survivors in accordance with numbers and need.

Letter from Professor Neuborne to Samuel Dubbin, Esq., dated October 2, 2003. Under these circumstances, I cannot conclude that the May 15, 2001 letter was by itself worth between $25 million and $100 million to the Looted Assets Class. Instead, I look at the letter in the context of this case as a whole.

The only arguably tangible benefit I recognize as resulting from Professor Neuborne's May 15, 2001 letter was Professor Neuborne's pledge to support a "serious, realistic plan for providing home and health care to needy survivors in the United States." But this pledge, of course, has not created any actual benefit to survivors due to Mr. Dubbin's continued failure to put forth such a plan. Again, the letter itself is not something worth compensation—only what benefits may have actually accrued to Mr. Dubbin's clients as a result of the letter could be worth compensation. Because of Mr. Dubbin's inaction, there have been none.

### CONCLUSION

This memorandum and order sets forth the reasons for my order of November 17, 2003, adopting the Special Master's Interim Report. It also specifically serves to (1) deny Mr. Dubbin's October 9, 2002 motion for reconsideration of my September 25, 2002 order regarding the distribution of excess funds, (2) deny Mr. Dubbin's December 2, 2003 motion for rehearing on my November 17, 2003 order, and (3) deny Mr. Dubbin's March 15, 2002 motion for

fees to the extent that it related to his efforts to reallocate a larger sum of money from the Looted Assets Class to survivors living in the United States.

**SO ORDERED.**