In re HOLOCAUST VICTIM
ASSETS LITIGATION.

This Document Relates to: All Cases.

Nos. CV–96–4849 (ERK)(MDG),
CV–99–5161, CV–97–461.

United States District Court,
E.D. New York.

April 22, 2004.

Burt Neuborne, New York University Law School, New York, NY, lead class counsel.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Holocaust Survivors Foundation–USA, Inc.

Roger M. Witten and Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

## MEMORANDUM

KORMAN, Chief Judge.

I now address the most recent filing of the Holocaust Survivors Foundation USA, Inc. (HSF) in connection with this case, the background of which is set forth at *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139 (E.D.N.Y.2000), and *In re Holocaust Victim Assets Litigation*, 302 F.Supp.2d 89 (E.D.N.Y.2004). On April 8, 2004, HSF filed a Response to Swiss Bank Allocation Submissions and a report of Professor Ira Sheskin, entitled Social Science Principles Applicable to estimating the Number of Nazi Victims and Their Economic Status. While these two submissions had previously been provided to the Special Master and posted on the website created for this case, *www.swissbankclaims.com*, HSF has now filed them with the Clerk of the Court to ensure that they are "part of the record in this matter concerning all issues." Notice of Filing, dated April 8, 2004, at 1. HSF took this step even though this filing was "not intended as HSF's response to Burt Neuborne's 'Affirmation' of February 20, 2004, nor the Court's March 9, 2004 Memorandum and Order." Holocaust Survivors Foundation–USA, Inc. Response to Swiss Bank Allocation Submissions, dated March 12, 2004, at 1 n. 1 (appended to Notice of Filing). Accordingly, I treat HSF's latest filing as what it is—one more piece of litter deposited by Mr. Dubbin in the court file. I respond to the expert report of Professor Sheskin, which, notwithstanding Mr. Dubbin's disingenuous disclaimer, is addressed explicitly to my memorandum and order of March 9, 2004. HSF previously filed an untimely Motion for Rehearing of that decision, which did not include Professor Sheskin's report.

█ HSF's expert makes three points, which I will address in turn. First, Professor Sheskin complains that my use of

individual survivors' stories in my March 9, 2004 memorandum and order was inappropriate. He writes that these accounts "might best be described as *anecdotal*," and that "[w]hile such evidence might be used in social science data to add interest to findings, it would never be used to refute data from quantitative findings." Social Science Principles Applicable to Estimating the Number of Nazi Victims and their Economic Status, Ira M. Sheskin, at 2 (hereafter "Sheskin Report") (appended to Notice of Filing). But I utilized the individual survivors' accounts in precisely the manner Professor Sheskin says is appropriate. The accounts of survivors in the Former Soviet Union provide color to the wealth of quantitative and qualitative data found in the Hesed network database and the most recent report of Sergio DellaPergola. *See* Judah Gribetz and Shari C. Reig, Special Master's Recommendations for Allocation of Possible Unclaimed Residual Funds, at 53–55. The accounts of survivors in the United States, meanwhile, give color to the quantitative data provided by the National Jewish Population Survey (NJPS). In particular, they explain the NJPS conclusion that only 2% of survivors in the United States "can't make ends meet" by revealing factors not included in the definition of poverty that nevertheless impact how survivors live. Indeed, the stories provide a picture of how, because of public and private social safety nets, 25% percent of survivors in the United States might live below the poverty line, but only 2% report that they "can't make ends meet." *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 105–107. Moreover, in the single instance where HSF provided its own quantitative data—for example, the affidavit from David Paikin, Senior Vice President of the United Jewish Community of Broward County, Florida—I analyzed it and showed why it did not merit a changed allocation scheme. *See id.* at 111–12.

Second, Professor Sheskin reacts to my comments on the sample size used in the NJPS. *See* Sheskin Report, at 3. In my March 9, 2004 opinion, I simply described the methodology behind the NJPS—something that is surely relevant. *See id.* at 99–100, 105. I wrote:

The NJPS was administered by the United Jewish Communities in 2000–2001 via telephone to approximately 4,500 Jews living in the United States. The survey included over 300 questions on a range of topics, including questions designed to ascertain whether a person was a Nazi victim. Of the 4,500 people surveyed, 146 were identified as Nazi victims. Thus, the information gleaned from the NJPS regarding the condition of survivors living in the United States (which it estimated to be a population of approximately 122,000) is based on questions posed to these 146 individuals.... [The] 146 survivors were requested to tell a complete stranger their income over the phone. Under these circumstances, a more trustworthy and revealing finding almost certainly came in response to the question: How would you evaluate your household's financial situation? Of the survivors who responded to the NJPS questions, under 2% (or an estimated 2,100 survivors out of the entire survivor population in the United States) reported that they "can't make ends meet."

*Id.* (citations omitted). Mr. Dubbin and Professor Sheskin took this statement of undisputed fact as criticism.

■ As Professor Sheskin concedes, "[a] sample size of 384 (often rounded to 400) is often used to meet the industry standard of being 95 % certain that no percentage is off by more than 5%, plus or minus." Sheskin Report, at 3. Thus, the 146 survivor sample size used by the NJPS was indeed a "small sample," as I later stated. *In re Holocaust Victim Assets Litig.*, 302

F.Supp.2d at 100 (E.D.N.Y.2004) (quoting Jewish Elderly Nazi Victims: A Synthesis of Comparative Information on Hardship and Need in the United States, Israel, and the Former Soviet Union, at 20 (January 20, 2004)). Professor Sheskin urges that even with the "small sample," I can be 95% confident that the NJPS's conclusion that 25% of survivors living in the United States live below the poverty line accurately indicates that the true percentage is between 18% and 32% (plus or minus 7%). *See* Sheskin Report, at 3. Professor Sheskin does not, however, address the second factor to which I alluded that surely affects the reliability of the NJPS conclusion, namely, the subject matter or phrasing of the survey's question. Indeed, this factor is why I relied on the more pertinent fact that only 2% of these survivors "can't make ends meet" notwithstanding the responses indicating that 25% of survivors lived below the poverty line. *See In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 105. Like the personal accounts to which I referred, this quantitative figure reflects that, even if I accept the NJPS conclusion that 25% of survivors in America live below the poverty line, private and public social safety nets generally prevent them from facing the same level of need as those in the FSU. While the number of survivors below the poverty level is a quantitative figure, it is only the beginning of the story.

■ Finally, Professor Sheskin disputes my statement—based on the NJPS—that there are 122,000 Jewish survivors of Nazi persecution in the United States, concluding instead that there are approximately 175,000. *See* Sheskin Report, at 5. This reflects HSF's desire to rely on one survey where it helps its claim and another where it hurts. Demographic estimates vary widely, and I do not propose to know exactly how many survivors there are in the United States. As the Special Master recently observed, estimates of Jewish sur-

vivors in the United States and Canada range from 109,900 to 174,000, or 15% to 19.3% of all survivors. *See* Judah Gribetz and Shari C. Reig, Special Master's Recommendations for Allocation of Possible Unclaimed Residual Funds, Annex C "Estimate and Size of Distribution of Jewish Nazi Victim Population." What is relevant to the analysis I have employed—and HSF accepts—is the number of needy survivors in the United States. *See In re Holocaust Victim Assets Litigation*, 302 F.Supp.2d at 95–97. For this figure, Professor Sheskin relies on the NJPS and concludes that there are some 60,000 by combining those who "can't make ends meet" and those who are "just managing." Sheskin Report, at 5. But as I have said again and again, when attempting to satisfy countless needs with a limited sum of money, we must look for the most pressing needs. Survivors in the United States who are "just managing" are nevertheless managing. Survivors in the FSU—individuals who often lack the bare necessities of life, including food, fuel, and the most basic medicines—can only manage through the distributions of the Looted Assets Class.